SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Cooper Hospital University Medical Center v. Selective Insurance Company of America** **(A-46-20) (085211)**

**Argued September 13, 2021 -- Decided December 22, 2021**

**ALBIN, J., writing for a unanimous Court.**

In this appeal, the Court considers who bears the primary responsibility for the payment of Dale Mecouch's medical bills arising from an automobile accident that took place before December 5, 1980 -- the issuer of an automobile insurance policy or Medicare.

In 2016, Mecouch was hospitalized for approximately two months at Cooper Hospital University Medical Center (Cooper) due to complications arising from a 1977 automobile accident that left him paralyzed from the waist down. At the time of his accident, Mecouch had a no-fault automobile insurance policy with Selective Insurance Company of America (Selective), which provided Mecouch with unlimited personal-injury-protection (PIP) benefits.

Sometime after 1979 but before 2016, Mecouch was enrolled in Medicare. Selective continued to pay Mecouch's medical expenses related to the 1977 accident until December 11, 2015, when it notified Mecouch by letter that, going forward, "Medicare is the appropriate primary payer for any treatment related to" the 1977 accident.

After Mecouch's 2016 hospital stay, Cooper forwarded to Selective a bill in the amount of over $850,000 for medical services rendered to Mecouch. Instead of paying that bill, Selective directed Cooper to seek reimbursement from Medicare. Cooper was a participating Medicare provider, and, at that time, Mecouch was a Medicare enrollee. Cooper then billed Medicare, which issued a payment of under $85,000. Selective eventually agreed to reimburse Cooper for Mecouch's co-payments and deductibles.

Cooper filed a complaint against Selective, seeking the total cost of Mecouch's care. The trial court granted summary judgment in favor of Cooper, awarding Cooper the cost of Mecouch's care minus the amount covered by Medicare. The Appellate Division reversed, concluding Medicare is the "primary payer" of medical bills for healthcare costs incurred by Mecouch at Cooper. The Court granted certification. 245 N.J. 470 (2021).

1

**HELD:** Because Mecouch was a Medicare enrollee in 2016, Cooper -- a Medicare provider -- was required to bill and accept payment from Medicare, which promptly covered Mecouch's medical expenses in accordance with its fee schedule. Cooper could not seek payment from Selective other than for reimbursement of the Medicare co-payments and deductibles.

1. Whether Selective or Medicare has primary responsibility for the payment of Mecouch's hospital bills turns on the interpretation of two statutory schemes: the New Jersey Automobile Reparation Reform Act (the No Fault Act) and Title XVIII of the Social Security Act (Medicare). In 1972, the Legislature passed the No Fault Act. Two of the principal aims of the Act were providing prompt care to automobile accident victims, regardless of fault, and constraining the spiraling cost of automobile insurance. The No Fault Act required car owners to have automobile insurance and, in return, required automobile insurers to provide PIP coverage for reasonable medical expenses incurred as a result of personal injury sustained in an automobile accident. To ensure the financial soundness of the no-fault system and to make automobile insurance premiums affordable, the Legislature also adopted a provision to shift the costs of medical care arising from automobile accidents to collateral sources, such as workers' compensation insurance and Medicare. Benefits collectible from a collateral source are typically deducted from benefits collected under PIP under N.J.S.A. 39:6A-6, "the collateral source rule." Under that rule, workers' compensation insurance and Medicare are the primary payers and the PIP carrier the secondary payer. And because, in the case of a work-related automobile accident, a workers' compensation insurance carrier is the primary payer, the Court recognized that a PIP carrier that pays benefits under a no-fault policy could "seek reimbursement from the workers' compensation provider." N.J. Mfrs. Ins. Co. v. Hardy, 178 N.J. 327, 339 (2004). (pp. 2-3, 17-21)

2. The primacy of Medicare, however, presents a scenario distinct from the workers' compensation setting in Hardy because of the statutory and regulatory requirements of federal law. Congress enacted Medicare to provide healthcare benefits to persons over the age of sixty-five, and expanded benefits in 1972 to persons under the age of sixty-five who suffer from severe disabilities. In the Medicare system, healthcare providers, such as Cooper, may contract with the Department of Health and Human Services (DHHS) to receive compensation for treating Medicare enrollees. Hospitals that contract with DHHS -- known as participating Medicare providers -- agree to accept reimbursement of medical expenses incurred by Medicare enrollees according to a schedule set by the Centers for Medicare and Medicaid Services (CMS), a division of DHHS. In contracting with DHHS, Cooper and other healthcare providers agree "not to charge . . . any individual or any other person" -- which includes corporations, like Selective, under federal law -- "for items or services for which such individual is entitled to have payment made under" Medicare. 42 U.S.C. § 1395cc(a)(1)(A) (emphasis added). Healthcare providers, however, may collect a patient's co-payments and deductibles, as determined by CMS, among other select costs. 42 U.S.C. § 1395cc(a)(2)(A). (pp. 21-24)

2

3.  In 1980, to ensure the financial viability of Medicare, Congress passed the Medicare Secondary Payer Act to expand the collateral sources that would have primary responsibility for paying the medical expenses of a Medicare enrollee.  Before December 5, 1980, Medicare was willingly the primary payer, even when automobile insurance was available to pay for an enrollee's medical expenses.  In the Secondary Payer Act, Congress prohibited Medicare from paying an enrollee's medical expenses "to the extent that payment has been made, or can reasonably be expected to be made" under a policy of workers' compensation insurance, "automobile or liability insurance . . . or . . . no fault insurance."  See 42 U.S.C. § 1395y(b) (1976 & Supp. IV 1980).  Requiring that no-fault automobile insurance carriers pay their insureds' medical expenses spared Medicare from shouldering those costs.  Congress granted DHHS authority to craft regulations to implement Medicare, and DHHS promulgated a regulation stating that the Secondary Payer Act does "not apply to any services required because of accidents that occurred before December 5, 1980."  The Secondary Payer Act, in effect, preempted the No Fault Act's collateral source rule as it pertained to Medicare.  (pp. 24-27)

4.  In this pre-December 5, 1980, automobile injury case, the objectives of the No Fault Act and Medicare are aligned.  The No Fault Act shifted to Medicare the primary responsibility for the payment of medical expenses arising from an automobile accident to reduce the financial costs borne by the automobile insurance system -- costs eventually passed on to the consumer.  Medicare, in turn, was a program designed to provide affordable medical insurance for the aged and disabled, and federal law prohibited healthcare providers from seeking additional compensation from Medicare enrollees or other insurers -- except to recoup such costs as co-payments and deductibles.  Thus, at the time of Mecouch's automobile accident in 1977, the No Fault Act designated Medicare as having primary responsibility for the payment of the medical costs of Medicare enrollees, and Medicare willingly accepted primary responsibility for the healthcare of its enrollees.  Congress later expanded Medicare's collateral source doctrine to include automobile insurance carriers and no-fault insurance in the Secondary Payer Act.  Under current federal law, the automobile insurance carrier has primary responsibility for the costs of a person's medical care for injuries suffered in automobile accidents arising after December 5, 1980.  (pp. 27-30)

5.  Mecouch, however, falls in a limited class of approximately 150 current New Jersey Medicare enrollees who were injured in automobile accidents before December 5, 1980, and whose medical care continues to be covered by Medicare as the primary payer.  The No Fault Act designated Medicare as the primary payer for Mecouch's medical expenses, and Medicare authorized the payment of those expenses.  The No Fault Act shifts the financial burden of an insured's medical expenses onto Medicare if that insured is a Medicare enrollee.  See N.J.S.A. 39:6A-6 (1977).  In line with its broad remedial purpose, Medicare will directly pay for an enrollee's medical expenses related to a pre-December 5, 1980 automobile accident.  Because the enrollee is entitled to have medical expenses covered by Medicare, the healthcare provider is barred from seeking

3

reimbursement from the enrollee or the enrollee's PIP carrier, except for the co-payment and deductible amounts. Healthcare providers that contract with Medicare -- such as Cooper -- know that they are barred from seeking further satisfaction "for items or services for which such individual is entitled to have payment made" by Medicare. 42 U.S.C. § 1395cc(a)(1)(A). If a healthcare provider seeks satisfaction from a PIP carrier instead of Medicare when treating a Medicare-enrolled patient, the healthcare provider must refund the money to the carrier after receiving reimbursement from Medicare. See 42 U.S.C. § 1395cc(a)(1)(C). (pp. 30-31)

6. The Court notes that here, Cooper has no reason to bill Selective first and should instead directly bill Medicare. In cases when a healthcare provider is not certain whether an insured is enrolled in Medicare, however, billing the PIP carrier first would further a core purpose of the No Fault Act, which is to provide automobile accident victims with the funds necessary for prompt medical care. If the insured in fact is a Medicare enrollee, then the healthcare provider must refund the monies received upon payment from Medicare. See 42 U.S.C. § 1395cc(a)(1)(C). (pp. 31-32)

7. This case is about legislative policies that set the order for the utilization of resources. Today, in accordance with the Secondary Payer Act, if Mecouch suffered serious injuries in an automobile accident and were treated in a Medicare participating hospital, such as Cooper, then his automobile insurance carrier would be responsible for payment of the hospital's bill. The hospital would receive a much higher billing return for its medical services because payment is coming from the carrier. But Congress's Medicare policy today is different from the policy in effect in 1977. Federal law in 1977 did not preempt the No Fault Act's designation of Medicare as a collateral source, and the Court must give effect to the federal and state statutory schemes that apply to Mecouch's 2016 hospital treatment and care arising from injuries that he suffered in a 1977 automobile accident. Applying those schemes, Cooper -- upon notice from Selective -- was required to bill Medicare for the hospital care rendered to Mecouch, a Medicare enrollee, and Selective is responsible for the co-payments and deductibles owed by Mecouch to Cooper. (pp. 32-34)

      **AFFIRMED. REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

# SUPREME COURT OF NEW JERSEY
## A-46 September Term 2020
## 085211

Cooper Hospital University Medical Center
on assignment by Dale Mecouch,

Plaintiff-Appellant,

v.

Selective Insurance Company of America,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| September 13, 2021 | December 22, 2021 |

Stanley G. Wojculewski argued the cause for appellant
(Costello Law Firm, attorneys; Stanley G. Wojculewski,
on the brief).

Laura A. Brady argued the cause for respondent
(Coughlin Midlige & Garland, attorneys; Laura A. Brady,
of counsel and on the brief, and Christa P. McLeod, on
the brief).

Robert B. Hille argued the cause for amicus curiae New
Jersey Hospital Association (Greenbaum, Rowe, Smith &
Davis, attorneys; Robert B. Hille, of counsel and on the
brief, and John W. Kaveney and Neil Sullivan, on the
brief).

1

Susan Stryker argued the cause for amicus curiae
Insurance Council of New Jersey (Bressler, Amery &
Ross, attorneys; Susan Stryker, of counsel and on the
brief).

JUSTICE ALBIN delivered the opinion of the Court.

In 2016, Dale Mecouch was hospitalized for approximately two months at Cooper Hospital University Medical Center (Cooper or Cooper Hospital) due to complications arising from a 1977 automobile accident that left him paralyzed from the waist down.  By the time of his 2016 hospitalization, Mecouch had become enrolled in Medicare.[1]  We must determine who bears the primary responsibility for the payment of the medical bills arising from his hospital treatment and care -- Selective Insurance Company of America (Selective), which issued the no-fault automobile insurance policy that provided Mecouch with unlimited personal-injury-protection (PIP) benefits, or Medicare.  The parties agree that Mecouch has no responsibility to pay those bills.

Whether Selective or Medicare has primary responsibility for the payment of Mecouch's hospital bills turns on the interpretation of two statutory schemes:  the New Jersey Automobile Reparation Reform Act (the

---

[1] He was not eligible for Medicare at the time of his accident.

2

No Fault Act), N.J.S.A. 39:6A-1 to -18 (1977); and Title XVIII of the Social Security Act (Medicare), 42 U.S.C. §§ 1395 to 1395*lll*.

In 1977, the No Fault Act mandated that every automobile insurance policy contain a provision requiring the insurer to pay "all reasonable medical expenses" -- PIP benefits -- to the insured and insured's family in the event they were injured in an automobile accident, regardless of who was at fault in causing the accident. N.J.S.A. 39:6A-4(a) (1977). The Act imposed on the automobile insurance carrier the responsibility of paying PIP benefits "as loss accrues," but provided that medical expenses payable from collateral sources, such as workers' compensation insurance and Medicare, were to be deducted from the PIP benefits. N.J.S.A. 39:6A-6 (1977) (the collateral source rule). Under the collateral source rule, the automobile carrier typically was expected to make prompt PIP payments first, but ultimately the collateral source had primary responsibility for the payment of the medical bills. N.J. Mfrs. Ins. Co. v. Hardy, 178 N.J. 327, 339 (2004).

In 1972, Congress expanded Medicare to provide healthcare benefits not only to the aged, but also to persons of any age who suffer from severe disabilities. Social Security Amendments of 1972, Pub. L. No. 92-603, § 201(a)(2), 86 Stat. 1329, 1371. At that time, Medicare was authorized to provide coverage for payment of an enrollee's medical expenses -- except for

3

those expenses covered by workers' compensation insurance.  <u>See</u> 42 U.S.C. § 1395y(b) (1976); <u>Fanning v. United States</u>, 346 F.3d 386, 388 (3d Cir. 2003).

In 1980, Congress passed the Medicare Secondary Payer Act to expand the field of collateral sources bearing primary responsibility for the payment of medical expenses of a Medicare enrollee.  <u>See</u> 42 U.S.C. § 1395y(b) (1976 & Supp. IV 1980).[2]  The Secondary Payer Act prohibited Medicare from paying an enrollee's medical expenses if an automobile insurance carrier could reasonably be expected to cover those costs.  <u>Ibid.</u>  The Act, however, operates prospectively.  The Department of Health and Human Services (DHHS) interpreted the Secondary Payer Act to apply only to automobile accidents occurring on or after December 5, 1980.  <u>See</u> 42 C.F.R. § 411.50; <u>Colonial Penn Ins. Co. v. Heckler</u>, 721 F.2d 431, 440 (3d Cir. 1983).  Given DHHS's interpretation of the Act, Medicare was responsible for paying such medical expenses as Mecouch's 2016 hospitalization, which related to injuries he suffered in his 1977 automobile accident.

Relying on its interpretation of the No Fault Act, Cooper filed an action in Superior Court to compel Selective to pay the entirety of Mecouch's 2016 medical bills in the amount of $853,663, including interest.  Selective replied

---

[2]  What is commonly known as the "Secondary Payer Act" was a part of the Omnibus Reconciliation Act of 1980, Pub. L. 96-499, § 953, 96 Stat. 2599, 2647.

4

that, pursuant to the No Fault Act's collateral source rule, Cooper, as a participating Medicare provider, was required to accept reimbursement solely from Medicare. The Medicare fee schedule limited payment to Cooper in the amount of $84,339.94; Selective eventually conceded its responsibility to pay $12,236 in Medicare co-payments and deductibles that Mecouch owed to Cooper.

Ultimately, the trial court granted judgment in favor of Cooper, ordering Selective to pay Cooper $769,323.06 (the full hospital bill minus the $84,339.94 Medicare was willing to pay). The court construed N.J.S.A. 39:6A-6 as placing on the automobile insurance carrier the primary obligation to pay medical expenses when billed, regardless of available collateral sources such as Medicare.

The Appellate Division reversed, finding that for automobile-accident injuries that occurred in 1977, under the No Fault Act and federal law, Medicare had primary responsibility. According to the Appellate Division, Cooper was required to bill Medicare -- the collateral source under N.J.S.A. 39:6A-6 -- not Selective, for Mecouch's 2016 medical expenses; however, Cooper could bill Selective for the Medicare co-payments and deductibles owed by Mecouch.

We substantially agree with the Appellate Division. As of 1977, two of the paramount goals of the No Fault Act were to provide prompt payment of medical expenses arising from an automobile accident, regardless of fault, and to contain the rising cost of automobile insurance premiums. See Caviglia v. Royal Tours of Am., 178 N.J. 460, 467 (2004) (citing Gambino v. Royal Globe Ins. Cos., 86 N.J. 100, 105-06 (1981)). The Legislature understood that the affordability of insurance premiums depended on stabilizing the costs borne by automobile insurance carriers. See Haines v. Taft, 237 N.J. 271, 284-85 (2019). To achieve that objective, the Legislature, in passing the No Fault Act in 1972, placed restrictions on the right of accident victims to sue for non-economic injuries, Caviglia, 178 N.J. at 466-67 (citing Sotomayor v. Vasquez, 109 N.J. 258, 261-62 (1988)), and shifted the primary responsibility for payment of medical expenses from automobile insurance carriers to certain collateral sources, such as workers' compensation insurance and Medicare, see N.J.S.A. 39:6A-6 (1977). Under the No Fault Act's collateral source rule, Medicare had primary responsibility and the PIP carrier secondary responsibility for paying medical bills arising from automobile accidents.[3] See ibid.

---

[3] The terms "PIP carrier" and "automobile insurance carrier" are used interchangeably.

6

At the same time, in 1977, for those enrolled in Medicare, federal law authorized Medicare to pay for an enrollee's medical expenses, including expenses arising from automobile accidents, with one notable exception: expenses covered by workers' compensation. See 42 U.S.C. §§ 1395d(a), 1395y(b) (1977). Thus, the No Fault Act's shifting of medical costs from the automobile insurance carrier to Medicare, pursuant to the collateral source rule, N.J.S.A. 39:6A-6 (1977), furthered the objective of both state and federal law at the time of Mecouch's accident in 1977.

For that reason, because Mecouch was a Medicare enrollee in 2016, Cooper -- a Medicare provider -- was required to bill and accept payment from Medicare, which promptly covered Mecouch's medical expenses in accordance with its fee schedule. Cooper could not seek payment from Selective other than for reimbursement of the Medicare co-payments and deductibles.

As explained in more detail in this opinion, we therefore affirm the judgment of the Appellate Division.

I.

A.

The facts are largely undisputed and based on the summary judgment record developed before the trial court.

In July 1977, Dale Mecouch, then twenty-three years old, was seriously injured in an automobile accident in California that rendered him a paraplegic in need of life-long medical care.  At the time, Mecouch was a New Jersey resident stationed in San Diego as a member of the Marine Corps.  Mecouch's driver's license listed his residence as his parents' home in Pitman, New Jersey.

In a declaratory judgment action brought by Mecouch, the Superior Court, Chancery Division, determined that Mecouch was covered by his father's automobile insurance policy issued by Selective.  Accordingly, the court ordered Selective to provide Mecouch with PIP benefits for all medical expenses arising from the 1977 automobile accident, as required by N.J.S.A. 39:6A-4 (1977).[4]

Sometime after 1979 but before 2016, Mecouch was enrolled in Medicare.  Selective continued to pay Mecouch's medical expenses related to the 1977 automobile accident until December 11, 2015, when it notified Mecouch by letter that, going forward, "Medicare is the appropriate primary payer for any treatment related to" the 1977 accident.

---

[4]  The court's order did not suggest in any way that the collateral source rule, N.J.S.A. 39:6A-6 (1977), was inoperative.

From February 15 to May 17, 2016, Mecouch was admitted to Cooper Hospital for the treatment of medical complications related to the 1977 accident. Cooper forwarded to Selective a bill in the amount of $853,663 for medical services rendered to Mecouch. Instead of paying that bill, Selective directed Cooper to seek reimbursement from Medicare. Cooper was a participating Medicare provider, and, at that time, Mecouch was a Medicare enrollee.

Cooper then billed Medicare, which issued a payment of $84,339.94 in satisfaction of the medical services that Cooper provided to Mecouch. Selective ultimately agreed to reimburse Cooper for Mecouch's co-payments and deductibles totaling $12,236.

B.

Cooper filed a complaint against Selective in the Superior Court, Law Division, seeking payment of the $853,663 it initially billed Selective.[5] While pursuing the action against Selective, Cooper refunded the $84,339.94 it received from Medicare. In answering Cooper's complaint, Selective claimed that Medicare was primarily responsible for the payment of Cooper's bill.

---

[5] Mecouch assigned his rights to Cooper for purposes of Cooper's coverage dispute with Selective.

After Cooper and Selective engaged in discovery and a failed mediation, both parties moved for summary judgment.

The trial court granted summary judgment in favor of Cooper. The court held that Selective was required to pay the entirety of the medical bill of $853,663 submitted by Cooper, minus the $84,339.94 Cooper received from and returned to Medicare. The court also awarded Cooper $33,340 in attorney's fees for Selective's improper denial of the PIP claim, pursuant to Rule 4:42-9(a)(6) and Cirelli v. Ohio Casualty Insurance Co., 72 N.J. 380, 384-85 (1977). In all, Selective owed Cooper a total of $802,663.06.

The court reasoned that, under N.J.S.A. 39:6A-6, Selective, as the PIP carrier, had to pay Cooper's bill when submitted -- even if Selective was "not ultimately the primary source obligated to make the payment." According to the court, because the No Fault Act "make[s] PIP benefits the immediate and primary source of medical expense payment," Selective "did not have the right in the first instance to simply deny the claim," even if Selective had a later right to seek reimbursement or deduct amounts received from collateral sources, such as Medicare. In its ruling, the court acknowledged that, under federal law, Medicare potentially has primary responsibility for providing benefits to automobile accident victims injured before December 5, 1980.

C.

In an unpublished opinion, the Appellate Division reversed and remanded.

In construing the federal statutes governing Medicare, including the Medicare Secondary Payer Act, the Appellate Division concluded that Medicare is the "primary payer" of medical bills for healthcare costs incurred by Mecouch at Cooper Hospital as a result of the 1977 automobile accident. The Appellate Division's interpretation of federal law accorded with its interpretation of the No Fault Act's collateral source rule, N.J.S.A. 39:6A-6, which, in this case, shifted the burden of paying medical bills from the PIP carrier to Medicare.

While acknowledging that, under the No Fault Act, PIP is the primary payer under most circumstances, the court emphasized that N.J.S.A. 39:6A-6 provides that payments from collateral sources "shall be deducted" from PIP payments. The "shall be deducted" language, in the court's view, is "most clearly understood as shifting the insurance coverage from automobile insurance to" collateral sources, such as workers' compensation insurance and Medicare, quoting Lambert v. Travelers Indem. Co. of Am., 447 N.J. Super. 61, 74 (App. Div. 2016).

11

That interpretation of the collateral source rule, the Appellate Division declared, "is logical and efficient, and comports with and does not present a conflict or obstacle to the federal Medicare method of payment." Because Cooper was a Medicare participating hospital, it agreed to accept Medicare's fee schedule and to forego any further payment for the costs of Mecouch's medical care, other than co-payments and deductibles, for which Selective was responsible. In that light, the Appellate Division determined that Medicare's payment of $84,339.94 to Cooper for Mecouch's medical care extinguished Mecouch's debt. In addition, the court ordered Selective to pay Cooper the $12,236 in co-payments and deductibles, plus interest, owed by Mecouch.

Going forward, the Appellate Division noted that if Mecouch was not covered under Medicare, Selective would be liable for the billed amounts in accordance with New Jersey's no-fault insurance scheme. On remand, the trial court was directed to determine the appropriate legal fees and costs.

We granted Cooper's petition for certification. 245 N.J. 470 (2021). We also granted the motions of the New Jersey Hospital Association and the Insurance Council of New Jersey to participate as amici curiae.

12

## II.

### A.

Cooper argues that the availability of a collateral source under N.J.S.A. 39:6A-6 does not preclude an insured -- or its assignee in this case -- from first seeking reimbursement of medical expenses from the PIP carrier, citing Hardy, 178 N.J. at 339. Cooper contends that the Appellate Division erred in construing N.J.S.A. 39:6A-6 as allowing Medicare's payment to entirely extinguish Selective's obligation to pay the balance of Mecouch's hospital bill.

In Cooper's view, even before the Medicare Secondary Payer Act, Congress could not have intended for Medicare to serve as the primary payer for the medical expenses incurred by automobile injury victims, given that state no-fault laws were not on the books at the time of Medicare's enactment in 1965. Although Cooper stresses that "nothing in the Medicare law itself states that Medicare is 'primary' to any other form of insurance in general," it concedes that before enactment of the Secondary Payer Act in 1980, Medicare generally issued payment even if there was another potential source of coverage.

In short, Cooper submits that Selective, as the PIP carrier, had to pay Cooper's bill, once tendered, even if Selective later sought reimbursement from Medicare.

The New Jersey Hospital Association generally echoes Cooper's arguments that Congress never intended Medicare to act as the primary payer in cases where automobile insurers were already contractually responsible to cover medical costs for their insureds. In that regard, the Association emphasizes that in 1977, the No Fault Act required PIP carriers to provide unlimited medical expense coverage to insureds. The Association expresses concern that, if the Appellate Division is affirmed, "PIP carriers will receive a windfall by receiving premiums for care that they are relieved from reimbursing" and overburdened hospitals "will face significant additional annual losses."

B.

Selective states that the only issue is whether it or Medicare will bear the costs of a patient's medical care in the limited number of automobile injury extended-care cases that occurred before passage of the Medicare Secondary Payer Act. Selective makes clear that "[e]ither way, the patient receives the necessary medical services and is assigned no financial responsibility." Selective argues "that the original Medicare statute enacted a 'primacy structure' that excepted only workers' compensation benefits." It agrees with the Appellate Division's pronouncement that "should Medicare find Mecouch

is not covered under its program, [Selective] is liable for the amounts" pursuant to the no-fault scheme.

Selective submits that the "proposed PIP-goes-first-offset" scheme is barred on federal preemption grounds. Additionally, it contends that Cooper's interpretation of N.J.S.A. 39:6A-6 essentially writes out of the collateral source rule the provision allowing Medicare benefits to be deducted from PIP benefits. According to Selective, had it paid Cooper's invoice, Mecouch's financial obligation would have been extinguished and federal law would have precluded a Medicare reimbursement. In its view, Medicare stands in the primary payer position, and Selective is responsible only for the co-payment and deductible amounts not paid by Medicare.

The Insurance Council of New Jersey urges that we affirm the Appellate Division, mostly for the reasons expressed by Selective. It underscores that the purpose of the collateral source rule is "to shift costs from the no-fault system to other responsible payers in order to reduce automobile insurance premiums." Shifting the costs to Medicare, the Council contends, is consistent with federal law at the time of Mecouch's 1977 accident when "Medicare served as primary insurance for all covered individuals . . . with the exception of workers' compensation insurance."

15

III.

A.

The question before the Court is straightforward:  does Selective or Medicare have primary responsibility for the payment of Mecouch's 2016 medical expenses at Cooper Hospital?  If Selective is primarily responsible, then Cooper receives the full payment of its bill with the cost borne by the automobile insurance system.  If Medicare is primarily responsible, then Cooper is bound by the Medicare fee schedule to which Cooper agreed.

The answer to the question depends on the policy choices made by the Legislature in passing the No Fault Act and Congress in passing Medicare.  To understand the policies adopted by the Legislature and Congress, we must look to the statutory schemes they enacted.  Our ultimate goal in this interpretive analysis is to determine what the Legislature and Congress intended.  The best indicator of legislative intent typically is found in the statutory language itself. DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citing Frugis v. Bracigliano, 177 N.J. 250, 280 (2003)).  In reviewing that language, we must give "the statutory words their ordinary meaning and significance."  Ibid. (citing Lane v. Holderman, 23 N.J. 304, 313 (1957)).  In addition, we must read related statutes and provisions in context with one another "to give sense to the legislation as a whole."  Ibid. (citing Chasin v. Montclair State Univ., 159 N.J.

16

418, 426-27 (1999)).  An understanding of the "legislative plan" may also be gleaned by reading the statutory scheme "in full light of its history, purpose, and context."  Chasin, 159 N.J. at 427 (quoting State v. Haliski, 140 N.J. 1, 9 (1995)).  Last, when construing federal and state statutes that relate to the same subject matter, we must view them together to see whether they have common or conflicting objectives.  See Hedgebeth v. Medford, 74 N.J. 360, 365-66 (1977).

With those familiar canons of statutory interpretation in mind, we now proceed to review the New Jersey No Fault Act and the federal law enacting Medicare.

B.

In 1972, the Legislature passed the No Fault Act, L. 1972, c. 70, §§ 1 to 18, to replace the traditional tort "fault" system in which automobile accident victims waited years for their medical bills to be paid "while their lawsuits lumbered through an overburdened court system."  Caviglia, 178 N.J. at 467 (citing Roig v. Kelsey, 135 N.J. 500, 502-03 (1994)).  One of the principal aims of the No Fault Act was to constrain the spiraling cost of automobile insurance.  DiProspero, 183 N.J. at 485.

The No Fault Act required the owner of an "automobile registered or principally garaged in this State" to have automobile insurance.  N.J.S.A.

17

39:6A-3 (1977). In return, the Act required automobile insurers to include in every automobile insurance policy a form of self-insurance -- "[p]ersonal injury protection [PIP] coverage, regardless of fault." N.J.S.A. 39:6A-4 (1977). PIP coverage guaranteed the insured, the insured's family and passengers, as well as pedestrians, the "[p]ayment of all reasonable medical expenses incurred as a result of personal injury sustained in an automobile accident." N.J.S.A. 39:6A-4(a) (1977). The No Fault Act placed restrictions on the "unlimited right to sue in exchange for the benefit of 'lower premiums and prompt payment of medical expenses.'" DiProspero, 183 N.J. at 485 (quoting Caviglia, 178 N.J. at 467).

To ensure the financial soundness of the no-fault system and to make automobile insurance premiums affordable, the Legislature also adopted a provision to shift the costs of medical care arising from automobile accidents to collateral sources, such as workers' compensation insurance and Medicare. N.J.S.A. 39:6A-6 (1977); see Lefkin v. Venturini, 229 N.J. Super. 1, 12 (App. Div. 1988). Under the collateral source rule, medical expenses, income-continuation expenses, essential-service expenses, survivor expenses, and funeral expenses provided in the PIP statute, N.J.S.A. 39:6A-4,

> shall be payable as loss accrues, . . . except that benefits collectible under workmen's compensation insurance, employees temporary disability benefit statutes and [M]edicare provided under Federal law, shall be

18

deducted from the benefits collectible under [the PIP statute].[6]

[N.J.S.A. 39:6A-6 (1977).]

Accordingly, benefits collectible from a collateral source are typically deducted from benefits collected under PIP. Ibid. Thus, if the collateral source satisfied the entirety of the medical expenses arising from an automobile injury, the PIP carrier would be relieved of making any payment. Under the collateral source rule, workers' compensation insurance and Medicare are the primary payers and the PIP carrier the secondary payer. Ibid.

Recently, we examined the collateral source rule in a case that dealt with the intersection of the Workers' Compensation Act, N.J.S.A. 34:15-1 to -147, and the Auto Insurance Cost Reduction Act (AICRA), N.J.S.A. 39:6A-1.1 to -35, the successor to the No Fault Act.[7] N.J. Transit Corp. v. Sanchez, 242 N.J. 78 (2020) (Patterson, J., concurring). An equally divided Court in Sanchez affirmed the Appellate Division, which concluded that New Jersey Transit,

---

[6] N.J.S.A. 39:6A-10 (1977) required PIP carriers to offer insureds additional PIP coverage, the details of which are not relevant here. It bears noting, however, that in the years that followed, the Legislature passed measures to limit PIP benefits to make automobile insurance premiums more affordable. Compare N.J.S.A. 39:6A-4(a) (1977), with N.J.S.A. 39:6A-4(a) (2021). See also DiProspero, 183 N.J. at 485-86 (describing the Legislature's evolving efforts to contain costs within the No Fault Act's framework).

[7] AICRA incorporates many of the No Fault Act's provisions, including the collateral source rule provisions at issue in this case. See N.J.S.A. 39:6A-6.

19

which had paid workers' compensation benefits to an employee injured in a work-related motor vehicle accident, could bring a subrogation claim against the alleged tortfeasor.  Id. at 79 (Patterson, J., concurring).

Despite the different views held on that issue, both the concurrence and the dissent agreed that, when medical expenses are covered by both no-fault automobile insurance and workers' compensation insurance, workers' compensation has primary responsibility for the payment of medical expenses pursuant to the collateral source rule.  See Sanchez, 242 N.J. at 90-91 (Patterson, J., concurring) ("From its inception, the No-Fault Law made clear that the burden to provide benefits to employees injured in work-related automobile accidents remained on the workers' compensation system."  (citing L. 1972, c. 70, § 6)); id. at 109-10 (Albin, J., dissenting) ("Since its inception, and in its present iteration, our no-fault law makes the workers' compensation system the primary source of reimbursement for economic damages suffered by a driver injured in a work-related automobile accident."  (citing L. 1972, c. 70, § 6)).[8]

Because, in the case of a work-related automobile accident, a workers' compensation insurance carrier is the primary payer under the collateral source

_____

[8] In Sanchez, the injured worker did not seek or receive PIP benefits.  242 N.J. at 81.

20

rule, we recognized that a PIP carrier that pays benefits under a no-fault policy could "seek reimbursement from the workers' compensation provider." Hardy, 178 N.J. at 339. We noted in Hardy that the injured worker, despite the availability of workers' compensation, could have sought PIP benefits first, although, in the end, workers' compensation still had primary responsibility for the medical costs related to the accident. See ibid.

The primacy of Medicare, however, presents a scenario distinct from the workers' compensation setting in Hardy because of the statutory and regulatory requirements of federal law. We therefore now turn to Medicare.

### C.

Congress enacted Medicare to provide healthcare benefits to persons over the age of sixty-five and to persons under the age of sixty-five who suffer from severe disabilities. See 42 U.S.C. § 1395c.[9] Significantly, for purposes of the facts before us, Medicare coverage is available to persons of any age who are entitled to receive disability insurance benefits for at least twenty-four months under the Social Security Act. Ibid. Among other benefits, Medicare "shall consist of entitlement to have payment made on [a person's] behalf . . . for . . . inpatient hospital services . . . for up to 150 days during any spell of

---

[9] Congress later amended Medicare to also include persons who suffer from end-stage renal disease. 42 U.S.C. § 1395(c).

illness . . . ." 42 U.S.C. § 1395d(a)(1).[10]  No one disputes that Mecouch was entitled to payment by Medicare for the "inpatient hospital services" provided by Cooper.  Ibid.

In the Medicare system, healthcare providers, such as Cooper, may contract with DHHS to receive compensation for treating Medicare enrollees. 42 U.S.C. § 1395cc(a)(1)(A).  Hospitals that contract with DHHS -- known as participating Medicare providers -- agree to accept payment for reimbursement of medical expenses incurred by Medicare enrollees according to a schedule set by the Centers for Medicare and Medicaid Services (CMS), a division of DHHS.  See 42 U.S.C. §§ 1395f(b), 1395ww; 42 C.F.R. §§ 412.1, 412.8. Federal regulations dictate that "Medicare pays hospital insurance benefits only to a participating provider," 42 C.F.R. § 409.100(a)(1), and define "participating" as "a hospital or other facility that meets the conditions of

---

[10]  We note that DHHS allows "[a] patient on admission to a hospital or skilled nursing facility [to] refuse to request Medicare payment and agree to pay for the services out of their own funds or from other insurance."  Medicare Claims Processing Manual ch. 1, § 50.1.5 (2021).  No one claims that Mecouch waived payment from Medicare.  Because the issue of waiver is not present in this case, we need not address whether a patient's waiver of Medicare payments, in a case such as this, would run afoul of the collateral source rule, N.J.S.A. 39:6A-6.

22

participation and has in effect a Medicare provider agreement," 42 C.F.R. § 409.3.[11]  As indicated earlier, Cooper is a participating Medicare provider.

In contracting with DHHS, Cooper and other healthcare providers agree "not to charge . . . any individual or any other person for items or services for which such individual is entitled to have payment made under" Medicare.  42 U.S.C. § 1395cc(a)(1)(A) (emphasis added).  Under federal law, Selective, as a corporation, is a person.  See 1 U.S.C. § 1 ("[T]he words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships . . . as well as individuals.").  Healthcare providers, however, may collect a patient's co-payments and deductibles, as determined by CMS, among other select costs, from an "individual or other person."  42 U.S.C. § 1395cc(a)(2)(A).

In 1977, at the time of Mecouch's automobile accident, Medicare was generally providing primary coverage for payment of an enrollee's medical expenses, except for those expenses covered by workers' compensation insurance.  See 42 U.S.C. § 1395y(b) (1977); see also Fanning, 346 F.3d at 388 ("Prior to 1980, Medicare generally paid for medical services whether or

---

[11]  Medicare will also pay hospital insurance benefits to nonparticipating providers "[f]or emergency services furnished by a nonparticipating hospital" and "[f]or services furnished by a Canadian or Mexican hospital," subject to federal regulations.  42 C.F.R. § 409.100(b).

23

not the recipient was also covered by another health plan." (citing Social Security Amendments of 1965, Pub. L. No. 89-97, § 1862(b), 79 Stat. 286)); Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund, 656 F.3d 277, 278 (6th Cir. 2011) (stating that before 1980, "Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained").

In 1980, to ensure the financial viability of Medicare due to skyrocketing health costs, Congress passed the Medicare Secondary Payer Act to expand the collateral sources that would have primary responsibility for paying the medical expenses of a Medicare enrollee. See Omnibus Reconciliation Act of 1980, Pub. L. 96-499, § 953, 96 Stat. 2599, 2647. The legislative history of the Secondary Payer Act makes clear that Congress understood that Medicare had been the "primary payor" of medical costs related to injuries suffered by Medicare enrollees in automobile accidents, generally relieving private automobile insurance carriers of that financial burden. That view is reflected in a report issued by the House Ways and Means Committee that endorsed passage of the Secondary Payer Act. The report stated:

> Under present law, Medicare is the primary payor (except where a workmen's compensation program is determined to be responsible for payment for needed medical services) for hospital and medical services received by beneficiaries. This is true even in cases in which a beneficiary's need for services is related to an

24

> injury or illness sustained in an auto accident and the services could have been paid for by a private insurance carrier under the terms of an automobile insurance policy. As a result, <u>Medicare has served to relieve private insurers of obligations to pay the costs of medical care in cases where there would otherwise be liability under the private insurance contract</u>.
>
> [H.R. Rep. 96-1167, at 389, reprinted in 1980 U.S.C.C.A.N. 5526, 5752 (1980) (emphasis added).]

Importantly, the report indicates that, before December 5, 1980, Medicare was the primary payer, even when automobile insurance was available to pay for an enrollee's medical expenses. <u>Ibid.</u> Federal jurisprudence also recognizes that "[u]ntil 1980, Medicare 'paid for services <u>without regard</u> to whether they were also covered by an employer group health plan.'" <u>N.Y. Life Ins. Co. v. United States</u>, 190 F.3d 1372, 1373 (Fed. Cir. 1999) (emphasis added) (quoting <u>Health Ins. Ass'n of Am. v. Shalala</u>, 23 F.3d 412, 414 (D.C. Cir. 1994)).

In the Secondary Payer Act, Congress prohibited Medicare from paying an enrollee's medical expenses "to the extent that payment has been made, or can reasonably be expected to be made" under a policy of workers' compensation insurance, "automobile or liability insurance . . . or . . . no fault insurance." <u>See</u> 42 U.S.C. § 1395y(b) (1976 & Supp. IV 1980).[12] Requiring

---

[12] Congress allowed Medicare to pay for an enrollee's care if it was uncertain whether the enrollee's workers' compensation, automobile, or no-fault

25

that no-fault automobile insurance carriers pay their insureds' medical expenses spared Medicare from shouldering those costs.

Congress granted DHHS authority to craft regulations to implement Medicare. See 42 U.S.C. §§ 1302, 1395hh. DHHS then promulgated a regulation stating that the Secondary Payer Act does "not apply to any services required because of accidents that occurred before December 5, 1980." See 42 C.F.R. § 411.50(a); Medicare Program, Services Covered Under Automobile Medical, No-Fault, or Liability Insurance; Services Furnished to ESRD Beneficiaries Who Are Covered Under Employer Group Health Insurance, 48 Fed. Reg. 14802-01 (Apr. 5, 1983).

The Secondary Payer Act, in effect, preempted the No Fault Act's collateral source rule as it pertained to Medicare. See U.S. v. Rhode Island Ins. Insolvency Fund, 80 F.3d 616, 622-23 (1st Cir. 1996). After December 5, 1980, Medicare became the secondary payer to a PIP carrier. See Abrams v. Heckler, 582 F. Supp. 1155, 1164-65 (S.D.N.Y. 1984).

In sum, the No Fault Act's collateral source rule of shifting the costs of medical expenses from PIP carriers to Medicare came to an end on December

---

insurance carrier would cover the enrollee's medical costs. See 42 U.S.C. § 1395y(b) (1976 & Supp. IV 1980). Once such insurers make payment to the provider, however, the provider must reimburse CMS for the amount that CMS paid. See ibid.; 42 C.F.R. §§ 411.22, 411.24.

5, 1980, given the supremacy of federal law. See Colonial Penn Ins. Co., 721 F.2d at 440; Abrams, 582 F. Supp. at 1164-65. Until that date, Medicare was authorized to pay an enrollee's medical expenses related to an automobile accident even if a PIP carrier would otherwise cover those expenses. See Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 832 F.3d 1229, 1234 (11th Cir. 2016).

## IV.

## A.

In this pre-December 5, 1980 automobile injury case, the objectives of the No Fault Act and Medicare are aligned. The No Fault Act shifted to Medicare -- and other collateral sources -- the primary responsibility for the payment of medical expenses arising from an automobile accident. See N.J.S.A. 39:6A-6 (1977) ("[B]enefits collectible under . . . [M]edicare . . . shall be deducted from the benefits collectible under [the PIP statutes]."). The purpose of the collateral source rule was to reduce the financial costs borne by the automobile insurance system -- costs eventually passed on to the consumer. See Lefkin, 229 N.J. at 12. From the Legislature's perspective, the logic of passing along costs to collateral sources is easy to discern. The larger the total payout of PIP benefits, the greater the need for insurance carriers to increase premiums to ensure their financial viability; increasing premiums to insure

27

vehicles decreases the number of middle- and lower-income residents able to afford automobile insurance; and decreasing the number of insured motor vehicles leads to greater instability in the automobile insurance market. See Auto. Ins. Study Comm'n, Reparation Reform for New Jersey Motorists 9-11 (Dec. 1971).

Medicare, in turn, was a program designed "to provide affordable medical insurance for the aged and disabled." See Furlong v. Shalala, 156 F.3d 384, 392 (2d Cir. 1998) (citing Garelick v. Sullivan, 987 F.2d 913, 914 (2d Cir.1993)). Medicare ensured that enrollees would not face the prospect of forgoing necessary healthcare because of lack of financial means. Cf. Rodriguez v. Celebrezze, 349 F.2d 494, 496 (5th Cir. 1965) ("[T]he Social Security Act is to be construed liberally to effectuate its general purpose of easing the insecurity of life. . . ." (citing Page v. Celebrezze, 311 F.2d 757, 762 (5th Cir. 1963))). As part of the overall Medicare scheme, federal law prohibited healthcare providers from seeking additional compensation from Medicare enrollees or other insurers -- except to recoup such costs as co-payments and deductibles. See 42 U.S.C. § 1395cc(a)(1)(A); Rybicki v. Hartley, 792 F.2d 260, 262-63 (1st Cir. 1986). Before December 5, 1980, Medicare had its own collateral source rule that exempted Medicare from

28

paying healthcare costs covered by a workers' compensation plan.  See 42 U.S.C. § 1395y(b) (1972).

Thus, at the time of Mecouch's automobile accident in 1977, the No Fault Act designated Medicare as having primary responsibility for the payment of the medical costs of Medicare enrollees, and Medicare willingly accepted primary responsibility for the healthcare of its enrollees.  At that point, state and federal law worked in tandem with each other.  Additionally, the No Fault Act and Medicare had common goals -- the prompt and efficient payment of medical expenses borne by individuals covered under those legislative schemes.  See Caviglia, 178 N.J. at 467 (citing Gambino, 86 N.J. at 105-06); United States v. Pisani, 646 F.2d 83, 86 (3d Cir. 1981) (noting that one of the objectives of Medicare is to provide "prompt reimbursements to providers" for the purpose of encouraging providers "to treat Medicare patients").

Congress expanded Medicare's collateral source doctrine to include automobile insurance carriers and no-fault insurance in the Secondary Payer Act.  Under current federal law, the automobile insurance carrier has primary responsibility for the costs of a person's medical care for injuries suffered in automobile accidents arising after December 5, 1980.  In the Secondary Payer Act, like our Legislature in the No Fault Act, Congress pursued the goal of

securing the financial viability of Medicare by further shifting costs to collateral sources.

Mecouch, however, falls in a limited class of approximately 150 current New Jersey Medicare enrollees who were injured in automobile accidents before December 5, 1980, and whose medical care continues to be covered by Medicare as the primary payer. In this case, the No Fault Act and Medicare are not in conflict. The No Fault Act designated Medicare as the primary payer for Mecouch's medical expenses, and Medicare authorized the payment of those expenses. The No Fault Act shifts the financial burden of an insured's medical expenses onto Medicare if that insured is a Medicare enrollee. See N.J.S.A. 39:6A-6 (1977).

In line with its broad remedial purpose, Medicare will directly pay for an enrollee's medical expenses related to a pre-December 5, 1980 automobile accident. See Pisani, 646 F.2d at 86; Fanning, 346 F.3d at 388; Bio-Med., 656 F.3d at 278; Health Ins. Ass'n, 23 F.3d at 414. Because the enrollee is entitled to have medical expenses covered by Medicare, the healthcare provider is barred from seeking reimbursement from the enrollee or the enrollee's PIP carrier, except for the co-payment and deductible amounts. See Holle v. Moline Pub. Hosp., 598 F. Supp. 1017, 1021 (C.D. Ill. 1984). That accomplishes the Legislature's goal of ensuring payment of medical costs for

30

automobile accident victims and reducing costs to the automobile insurance system, while also advancing Congress's goal of providing affordable, prompt healthcare to Medicare enrollees. See Emmer v. Merin, 233 N.J. Super. 568, 572 (App. Div. 1989) (citing Mario A. Iavicoli, No Fault & Comparative Negligence in New Jersey 20 (1973)); Pisani, 646 F.2d at 86.

As earlier discussed, healthcare providers that contract with Medicare -- such as Cooper -- know that they are barred from seeking further satisfaction "for items or services for which such individual is entitled to have payment made" by Medicare. 42 U.S.C. § 1395cc(a)(1)(A). If a healthcare provider seeks satisfaction from a PIP carrier instead of Medicare when treating a Medicare-enrolled patient, the healthcare provider must refund the money to the carrier after receiving reimbursement from Medicare. See 42 U.S.C. § 1395cc(a)(1)(C) (requiring healthcare providers "to make adequate provision for return . . . of any moneys incorrectly collected from such individual or other person").

In light of Medicare's primary responsibility to pay the medical expenses of Mecouch's hospital care, and its willingness to do so promptly, Cooper has no reason to bill Selective first. Instead, Cooper should directly bill Medicare. That approach will avoid needless waste and duplication of effort and fulfill Medicare's promise of prompt care and the No Fault Act's

31

goal of shifting costs to collateral sources when possible.  See Talmadge v. Burn, 446 N.J. Super. 413, 418 (App. Div. 2016) (citing Lefkin, 229 N.J. Super. at 7).

However, we recognize that there may be cases when a healthcare provider is not certain whether an insured is enrolled in Medicare.  In such an instance, billing the PIP carrier first would further a core purpose of the No Fault Act, which is to provide automobile accident victims with the funds necessary for prompt medical care.  See Caviglia, 178 N.J. at 467.  If the insured in fact is a Medicare enrollee, then the healthcare provider must refund the monies received upon payment from Medicare.  See 42 U.S.C. § 1395cc(a)(1)(C).

## B.

In the end, this case is about legislative policies that set the order for the utilization of resources.

Had Mecouch suffered serious injuries from an accident in the home or been stricken with a severe illness, then a Medicare provider, such as Cooper, would accept reimbursement from Medicare, according to the fee schedule set by DHHS.  See 42 U.S.C. §§ 1395f(b), 1395ww; 42 C.F.R. §§ 412.1, 412.8. That fee schedule clearly does not permit a dollar-for-dollar return on the value of medical services.  See generally Eric Lopez et al., How Much More

32

Than Medicare Do Private Insurers Pay?  A Review of the Literature (Apr. 15, 2020), Kaiser Fam. Found., https://www.kff.org/medicare/issue-brief/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature/ (last visited Dec. 8, 2021) (highlighting differences in payment between Medicare and private insurers).  As with many hospital systems in our State, Cooper has accepted its role in the Medicare system -- a role that affords a great benefit to the people of this State who are dependent on the critical medical services provided by hospitals and physicians participating in Medicare.  The allocation of resources pursuant to Medicare is a product of Congressional policy and the willingness of hospitals and physicians to participate in the Medicare program.

Today, in accordance with the Secondary Payer Act, if Mecouch suffered serious injuries in an automobile accident and were treated in a Medicare participating hospital, such as Cooper, then his automobile insurance carrier would be responsible for payment of the hospital's bill.  The hospital would receive a much higher billing return for its medical services because payment is coming from the carrier.  See 42 C.F.R. § 411.31(b) ("With respect to . . . no-fault insurers, . . . a provider or supplier may bill its full charges and expect those charges to be paid unless there are limits imposed by laws other than [T]itle XVIII of the Act or by agreements with the primary payer.").  The

33

Secondary Payer Act is a product of Congressional policy, which places the automobile insurance carrier as the primary payer, thereby preempting the No Fault Act's collateral source rule.  See 42 U.S.C. § 1395y(b)(2)(A).

Congress's Medicare policy today is different from the policy in effect in 1977.  Federal law in 1977 did not preempt the No Fault Act's designation of Medicare as a collateral source.  Our role is to give effect to the federal and state statutory schemes that apply to Mecouch's 2016 hospital treatment and care arising from injuries that he suffered in a 1977 automobile accident.  We have no commission to "interfere with the policy choices made by the Legislature" in deciding how to achieve cost savings through the No Fault Act. DiProspero, 183 N.J. at 506.

We conclude that Cooper -- upon notice from Selective -- was required to bill Medicare for the hospital care rendered to Mecouch, a Medicare enrollee.  That Selective may have unwittingly paid for services in the past covered by Medicare -- to the benefit of Cooper -- is not relevant to the issue before us.  Selective, however, is responsible for the co-payments and deductibles owed by Mecouch to Cooper.

V.

For the reasons expressed, we affirm the judgment of the Appellate Division and remand to the trial court for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion. JUSTICE FERNANDEZ-VINA did not participate.